UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,          )
                                   )
              v.                   )
                                   )  Cr. No. 09-10166-MLW
RICHARD W. McDONOUGH,              )
      Defendant.                   )

MEMORANDUM AND ORDER

WOLF, D.J.                                    January 30, 2017

I.   SUMMARY

In 2011, the court sentenced defendant Richard McDonough, a lobbyist, to seven years in prison for orchestrating a scheme to fraudulently use the official power of the Speaker of the Massachusetts House of Representatives Salvatore DiMasi to extort payments from a company seeking state contracts for computer software worth more than $17,000,000. McDonough began serving his sentence later that year.

McDonough told the Probation Officer preparing his Presentence Report ("PSR") that he had not used any illegal drugs since the 1990s, that his use of alcohol was not problematic, and that he never participated in or needed any treatment for substance abuse. Therefore, in sentencing McDonough to serve two years Supervised Release, the court did not impose any condition concerning substance abuse testing or treatment.

However, upon entering Bureau of Prison's ("BOP") custody, McDonough claimed that he had used cocaine weekly and abused alcohol daily during the 12 months prior to being charged in this case in June, 2009. The BOP subsequently found that McDonough had an alcohol disorder. It admitted him to its intensive Residential Drug and Alcohol Abuse Program ("RDAP") despite the fact that McDonough could not provide documentation demonstrating that he had been diagnosed with, and treated for, alcoholism in the year before being charged -- documentation which was required by the BOP's published RDAP policy. In 2016, McDonough was deemed to have successfully completed the RDAP although he was evaluated by the BOP as having only a "fair" prognosis for not abusing alcohol in the future. Nevertheless, the BOP exercised its discretion to reduce McDonough's sentence by 12 months.

Following a hearing that demonstrated, to the court at least, that the BOP had improperly admitted McDonough to the RDAP, the BOP declined to revise its decision to release McDonough a year before his sentence would ordinarily have been served. Accordingly, McDonough was released from custody on January 3, 2017.

After providing McDonough notice, on January 5, 2017, the court held a hearing to address whether McDonough's conditions of Supervised Release should be modified in view of the BOP's determination that he had a substance abuse disorder. On January

2

9, 2017, the court modified the conditions of McDonough's Supervised Release in an effort to reduce the risk that McDonough will drink or illegally use drugs while being supervised by Probation. The court also ordered that McDonough obtain the approval of Probation before engaging in any remunerative activity in an effort to assure that McDonough will not while on Supervised Release resume a lifestyle that involves "wining and dining" or again commit crimes in connection with his work.

At the January 5, 2017 hearing McDonough did not dispute that some additional conditions concerning the use of alcohol were appropriate. However, McDonough objected to certain proposed conditions, asserting that he could be trusted not to drink again. In view of McDonough's conviction for fraud in this case, his implicit contention that he lied to Probation when he claimed not to have used drugs illegally since the 1990's or abused alcohol, and pending state fraud charges against him, the court has found that it should not rely on McDonough's promises alone. Rather, conditions aimed at keeping McDonough from the temptation to drink and monitoring his compliance with them are necessary and appropriate.

At the January 5, 2017 hearing, McDonough expressed concern about the proposed condition that there be no alcohol in his residence because his wife has a wholesale wine business and conducts wine-tastings in their home. He also opposed the proposed

condition prohibiting him from being with any individual who is drinking. Neither of these objections were persuasive. However, in response to McDonough's motion to reconsider the January 9, 2017 Order, the court is giving Probation the discretion to allow McDonough to attend particular family and other social events at which it is foreseeable someone may be drinking. With this modification, the court finds that each of the new conditions of Supervised Release imposed on January 9, 2017 is permissible and appropriate in view of the record now before the court.

McDonough's compliance with the conditions of his Supervised Release will be monitored, in part, by technology that allows Probation to identify his location and to conduct an immediate breathalyzer test. Such monitoring is necessary because, as explained earlier, the BOP rated McDonough's prognosis for abstinence from alcohol as only "fair" and because McDonough has repeatedly demonstrated that he cannot be trusted.

The reasons for these decisions are explained more fully in this Memorandum.

II.  PROCEDURAL HISTORY

On September 9, 2011, the court sentenced DiMasi to eight years in prison and McDonough to seven years in prison for conspiring to use DiMasi's office as the Speaker of the Massachusetts House of Representatives to commit extortion, mail fraud, and wire fraud.  The court subsequently denied DiMasi and

McDonough's motion for release pending appeal. See United States v. DiMasi, 817 F. Supp. 2d 9, 12 (D. Mass. 2011). McDonough began serving his sentence on November 30, 2011. In 2013, the First Circuit affirmed McDonough's conviction and sentence. See United States v. McDonough, 727 F. 3d 143, 166 (1st Cir. 2013).

In McDonough's PSR, the Probation Officer wrote that McDonough told her that he had tried cocaine in the 1960's and that he had last used marijuana in the 1990s. See PSR, ¶107. In addition, the Probation Officer wrote that:

> The defendant denies ever using any other controlled substances. He advises his use of alcohol, marijuana, and cocaine has never been problematic and that he has never participated in, or needed any, substance abuse counseling.

PSR, ¶108. In view of this information, the court did not order drug or alcohol testing or treatment as a condition of McDonough's two-year period of Supervised Release.

While serving his sentence, however, McDonough told the BOP that he had used cocaine weekly and abused alcohol daily in the year before being charged in this case on June 2, 2009. See May 18, 2016 Bureau of Prisons Progress Report (Docket No. 875) at 8.[1]

---

[1] McDonough's statements to the Probation Officer who prepared the PSR and to BOP officials directly contradict each other. At least one of McDonough's versions of his history is materially false. A knowing and willful false statement to an official of the BOP is a crime under 18 U.S.C. §1001. See United States v. Davis, 8 F. 3d 923, 929 (2nd Cir. 1993). Such a statement to a Probation Officer may also be a crime. Compare United States v. Manning, 526 F. 3d 611, 621 (10th Cir. 2008)(holding that false statements made by a

McDonough then applied to participate in the RDAP. An inmate who successfully completes the RDAP is eligible for a reduction in his sentence by the BOP of up to one year. See 18 U.S.C. §3621(e)(2)(B).

At a November 9, 2016 hearing, Dr. Sharon Kotch of the BOP testified that in determining whether an inmate has a substance abuse disorder and is, therefore, eligible for the RDAP, the BOP "has historically placed primary reliance on prisoners' self-reporting to the Presentence Report (PSR) writer...[A]ny claim of a disorder that the PSR does not plainly substantiate is treated as suspect." Nov. 9, 2016 Transcript ("Tr.") at 25-26. Dr. Kotch also testified that officials of the BOP are trained to be skeptical about applicants for the RDAP, who are known to have an incentive to lie to get into the program and obtain a reduction in their sentence. See Nov. 9, 2016 Tr. at 24; see also Alan Ellis and Todd Bussert, Looking at the BOP's Amended RDAP Rules, 26 Criminal Justice Magazine 3, Fall 2011, at 37, 38, available at http://www.americanbar.org/publications/ criminal_justice_magazine_ home/fall2011.html.

---

defendant to a probation officer during a presentence interview are a crime) with United States v. Horvath, 492 F. 3d 1075, 1080 (9th Cir. 2007)(holding that such statements are protected by a statutory exemption to §1001 that protects statements "submitted by [a] party . . . to a judge" in a judicial proceeding).

Where, as here, the Presentence Report does not include information indicating a substance abuse disorder and no probation officer or social service professional has verified the inmate's substance abuse in the 12-month period prior to the inmate being charged, the BOP's published policy requires that an applicant for the RDAP provide:

> [D]ocumentation from a substance abuse treatment provider or medical provider who diagnosed and treated the inmate for a substance abuse disorder within the 12-month period before the inmate [was charged]...
>
> This document must have been written at the time services were provided and must demonstrate that a substance use diagnosis was completed at the time [the inmate was] seen, and that treatment was provided for that documented substance abuse diagnosis...
>
> For example, the documentation may not state that the substance abuse treatment provider thought [the inmate] had an alcohol or other drug problem when he or she saw [the inmate] for a medical or psychological problem.

Federal Bureau of Prisons, Program Statement 5330.11, Psychology Treatment Programs (March 16, 2009), https://www.bop.gov/policy/progstat/5330_011.pdf (the "RDAP Policy") at §2.5.8(2)-(3); Nov. 9, 2016 Tr. at 40-41.

Dr. Kotch, however, approved McDonough for admission to the RDAP without the required evidence that he had ever been diagnosed and treated for a substance abuse disorder, let alone in the 12 months before being charged in this case. In admitting McDonough to the RDAP based on a finding of an alcohol abuse disorder, Dr.

Kotch relied instead on a letter and related records from 2005 to 2008 submitted to the BOP by McDonough's cardiologist. See Declaration of Sharon Kotch (Kotch Decl.), Exhibit ("Ex.") F (Docket Nos. 876-2, 879 (under seal), 886 (redacted), Nov. 9, 2016 Ex. 8). While the cardiologist's transmittal letter characterized McDonough as "alcohol dependent," his contemporaneous notes refer to McDonough's drinking only in the context of the doctor's advice that McDonough lower his cholesterol and blood pressure. Id. For example, the doctor's October 2, 2007 notes, in pertinent part, state that McDonough:

> Takes a significant amount of alcohol related to his work. He might, for example, take half a bottle of wine a day, 6-8 ounces of vodka, and 1 or 3 beers...He continues to work as a lobbyist at the State House...

Kotch Decl. Ex. F (Docket No. 886) at 9-10. McDonough's doctor did not, however, then diagnose McDonough with an alcohol disorder. Nor did he recommend or provide him treatment for an alcohol disorder. Rather, he diagnosed McDonough as having "borderline hypertension" and "elevated cholesterol." Id. at 7-8. The cardiologist recommended that McDonough "cut his alcohol intake in half, lose 10 lbs., and increase his exercise." Id. at 7-8.

Therefore, McDonough's request for admission to the RDAP was not supported by the evidence required by the BOP's RDAP Policy. More specifically, it was deficient because the documents on which Dr. Kotch relied were not written at the time of any treatment for

alcohol abuse; indeed, McDonough never had any such treatment. Compare RDAP Policy at §2.5.8(2)-(3). In addition, the cardiologist was not a "substance abuse treatment provider." Id. at (3). Moreover, the references to McDonough's drinking were made when the doctor saw him for hypertension and high cholesterol. See id. Nevertheless, Dr. Kotch admitted McDonough to the program.[2]

---

[2] The BOP's decision to admit McDonough to the RDAP raises questions concerning whether the BOP's administration of that program is resulting in the type of unwarranted disparity that courts are legally obligated to seek to avoid in sentencing. See 18 U.S.C. §3553(a)(6). This court, among many others, at times recommends that defendants with documented drug addictions be admitted to the RDAP. Often those recommended became addicted to drugs as teenagers, if not earlier. Many are young African-American or Latino defendants without the resources to retain counsel or other professionals to advise them on how to gain entry to the RDAP or advocate that they receive drug treatment while in prison. Frequently, the court learns in a later revocation of Supervised Release proceeding that the defendant was not admitted to the RDAP and sometimes that he was not offered any drug treatment by the BOP at all.

The fact that McDonough was admitted to the RDAP without the documentation required by the BOP's RDAP Policy raises questions concerning whether more privileged, "white collar" criminals are gaining entry to the RDAP and being allowed to earn a reduction in their sentences, while less fortunate, less educated, less wealthy, or less articulate defendants with well-documented addictions are not. However, decisions whether to admit an inmate to the RDAP and to grant a reduction of his sentence are virtually unreviewable by the courts. See 18 U.S.C. §3621(e)(2)(any inmate who "in the judgment of the Director of the [BOP]" is deemed to have successfully completed a program of substance abuse treatment "may" have his sentence "reduced by the [BOP]."); United States v. Jackson, 70 F. 3d 874, 877-78 (6th Cir. 1995)("[I]t is solely within the authority of the [BOP] to select those prisoners who will be best served by participation in such programs"); Downey v. Crabtree, 100 F. 3d 662, 671 (9th Cir. 1996)("Like the drug-treatment placement decisions at issue in Jackson, decisions regarding whether to grant or deny eligible inmates a sentence

The BOP subsequently found that McDonough had successfully completed the RDAP. The BOP then exercised its discretion to reduce his sentence by one year, giving McDonough a presumptive release date of January 3, 2017.

As the BOP prepared to transfer McDonough to the community to complete his sentence, McDonough's RDAP counselor noted that McDonough's "prognosis for abstinence from alcohol abuse" was only "FAIR." Declaration of Edward Baker ("Baker Decl."), Ex. 8 at 3 (Docket No. 876-3 at 27 of 35). The counselor wrote that:

> Mr. McDonough's weaknesses include superoptimism and permission thoughts. While he may have maintained sobriety for several years in the past, it will be important for Mr. McDonough to remember that substance dependence does not have a definitive cure, and be realistic about the relapse triggers he will face upon reentry. Mr. McDonough discussed his use of permission thoughts to justify alcohol use as a reward or "part of the job." He will need to be mindful of his thoughts related to alcohol use in order to maintain long-term recovery.

Id. at 2 (Docket No. 876-3 at 26 of 35). (emphasis added).

---

reduction under §3621(e) remain within the Bureau's discretion."); Davis v. Beeler, 966 F. Supp. 483, 489 (E.D. Ky. 1997)("[T]he substantive decision of the BOP to grant or deny early release to a prisoner is precluded from judicial review by [18 U.S.C. §§3621 and 3625].").

The court believes that this degree of discretion imposes on BOP the duty to assure that its decisions concerning admission to the RDAP do not undermine the efforts of judges to avoid unwarranted disparities in the sentences of similarly situated defendants. The future conduct of the BOP will determine whether its decision concerning McDonough is consistent with this goal. Cf. United States v. DiMasi, 2016 WL 6818346 at *23 (D. Mass. Nov. 17, 2016).

The counselor expressed particular concern about the wine business McDonough's wife had started while he was incarcerated, writing:

> Mr. McDonough continued to express a seemingly sincere desire to maintain a long-term recovery. However, he appeared to minimize the potential relapse triggers that his wife's wine wholesale business, which she operates from their home, could present. On at least one occasion Mr. McDonough spoke on the phone with his wife, who appeared to be hosting a social gathering that involved wine tasting. When asked how her business might impact his recovery, he explained he maintained several years of sobriety in the past, and can do it again if he is determined. He was provided feedback on the importance of preparing for relapse triggers related to his wife's business, rather than minimizing the potential for relapse and viewing himself as cured.

Baker Decl. Ex. 8 at 2 (Docket No. 876-3 at 26 of 35)(emphasis added).

The BOP released McDonough to a Community Confinement Center on July 13, 2016. See Baker Decl. (Docket No. 876-2) at ¶10. After August 15, 2016, McDonough lived at home and received out-patient treatment for alcohol abuse at Hope House, Inc. See Declaration of Shannon Hart (Docket No. 876-4) at ¶¶12-13.

In October 2013, the BOP filed a motion, pursuant to 18 U.S.C. §3582(c)(1)(A)(i), seeking a reduction of DiMasi's sentence to time-served based on a deterioration of his health and difficulty in functioning in prison.[3] While working on the DiMasi motion, the

---

[3] The court granted the motion for a reduction in sentence, ordered DiMasi's release, and modified the conditions of his Supervised Release to address his medical needs. See United States v. DiMasi, 2016 WL 6818346, at *23-26 (D. Mass. 2016).

court recognized that the BOP had itself reduced McDonough's sentence. After consulting Probation, the court concluded that a modification of McDonough's conditions of Supervised Release should be considered.

On November 9, 2016, the court conducted a hearing at which Dr. Kotch testified and counsel for the BOP explained the decision to admit McDonough to the RDAP. The hearing demonstrated to the court, at least, that McDonough had been deemed eligible for the program without the documentation required by BOP's RDAP Policy. The BOP agreed to review the matter and report whether it would maintain, modify, or withdraw McDonough's conditional early release. See 18 U.S.C. §3621(c)(2)(B); Nov. 9, 2016 Order (Docket No. 904) at ¶2; Nov. 9, 2016 Tr. at 75-79.[4] The BOP subsequently reported that it had not revised its decision to reduce McDonough's sentence. See Docket No. 911-1. Therefore, McDonough was released from custody on January 3, 2017.

The court gave McDonough notice that it was considering modifying the conditions of McDonough's Supervised Release in certain respects. See Dec. 29, 2016 Order (Docket No. 912); Jan. 3, 2017 Order (Docket No. 916). On January 5, 2017, a hearing was

---

[4] The court's request that the BOP reconsider whether McDonough's early release was justified was not unprecedented. At the request of the United States Attorney, the BOP had previously reviewed and reversed its June 2016 decision not to file a motion for a reduction in DiMasi's sentence. See DiMasi, 2016 WL 6818346 at *22-23.

held to address such possible modifications. See F. R. Crim. P. 32.1(c)(1). Counsel for McDonough and for the government, as well as the Chief Probation Officer, spoke. McDonough was also offered an opportunity to speak, which he declined. See id.

On January 9, 2017, the court issued an Order modifying the conditions of McDonough's Supervised Release in view of the information concerning substance abuse that was not available when he was sentenced in 2011. See Docket No. 919.

On January 23, 2017, McDonough filed a Motion for Reconsideration of the January 9, 2017 Order. McDonough requests revision of the following two new conditions of Supervised Release:

> 5. McDonough shall not be in the presence of any individual who he knows is (a) consuming alcohol and/or (b) using a substance not prescribed by a doctor.

> 6. McDonough shall not enter any establishment whose primary purpose is selling alcohol, including beer, wine, or liquor, or sells such beverages to consumers. McDonough's compliance with this condition, among others, may be periodically monitored by use of the Outreach Smartphone Monitoring system.

Docket No. 919 at 2. As explained in §IV, infra, the court is now amending each of these conditions.

III. THE APPLICABLE LAW

18 U.S.C. §3583(e)(2) authorizes the court, after considering "the factors set forth in [18 U.S.C. §§]3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7)," to "extend a term of supervised release if less than the maximum

authorized term was previously imposed," and to "modify, reduce, or enlarge the conditions of supervised release, at any time prior to the expiration or termination of the term of supervised release." This means, among other things, that the court could now extend the term of McDonough's Supervised Release beyond the two years that was considered sufficient in 2011, before there was any reason to believe that McDonough might require treatment for substance abuse. The court may not, however, now lengthen the period of McDonough's Supervised Release to reflect the seriousness of his offense or provide just punishment for it because these are factors set forth in §3553(a)(2)(A) and may only be considered at sentencing. See DiMasi, 2016 WL 6818346 at *24 n. 15.

Section 3583(d) authorizes the court to impose "any condition set forth as a discretionary condition of probation in [18 U.S.C. §]3563(b) and any other condition it considers to be appropriate." Such conditions include ordering the defendant to "undergo available medical, psychiatric, or psychological treatment, including treatment for drug or alcohol dependency, as specified by the court, and remain in a specified institution if required for that purpose." §3563(b)(9).

In deciding whether to modify conditions of Supervised Release, in addition to §3583(d), the court must consider United States Sentencing Guideline ("U.S.S.G.") §5D1.3(b). Like that

14

statute, the Guideline provides that, among other things, the court may impose conditions that are "reasonably related" to the "history and characteristics of the defendant" and the need to provide him with "correctional treatment in the most effective manner." §5D1.3(b); see also United States v. Brown, 235 F. 3d 2, 5 (1st Cir. 2000). If "the court has reason to believe" that the defendant has abused drugs or alcohol, conditions requiring testing and treatment, and prohibiting the possession or use of alcohol are recommended. See §5D1.3(d)(4). Other conditions reasonably related to alcohol and/or drug abuse are also authorized. See §5D1.3(b).

As the First Circuit has recently written:

> 18 U.S.C. §3583(d) and U.S.S.G. §5D1.3(b) [] together require that the conditions "involve[] no greater deprivation of liberty than reasonably necessary" to achieve the goals of the sentence,[5] 18 U.S.C. §3583(d)(2), and that the conditions be "'reasonably related' both to these goals and to the 'nature and circumstances of the offense and the history and characteristics of the defendant,'" United States v. Perazza-Mercado, 553 F. 3d 65, 69 (1st Cir. 2009)(quoting 18 U.S.C. §3583(d)(1) and §3553(a)(1)).

United States v. DaSilva, 844 F. 3d 8, 11 (1st Cir. 2016); see also United States v. Pabon, 819 F. 3d 26, 30 (1st Cir. 2016). However, "[t]he fact that a condition of supervised release is not directly related to the crime of conviction does not render that

---

[5] As explained earlier, in modifying conditions of Supervised Release, the court may not consider the original sentencing goals of reflecting the seriousness of the offense and providing just punishment which are set forth in §3553(a)(2)(A). See §§3583(e)(2) and 3583(a)(2)(A).

condition per se invalid." Pabon, 819 F. 3d at 30 (citing United States v. Sebastian, 612 F. 3d 47, 50 (1st Cir. 2010).

Information that was not available to the court at the time of sentencing may justify a modification of conditions of Supervised Release. See United States v. Begay, 631 F. 3d 1168, 1175 (10th Cir. 2011)(upholding new polygraph testing condition where, nearly 14 years after sentencing and shortly before the defendant's release, the court "heard evidence that polygraph testing could be an effective supervision and rehabilitation tool" in ensuring that the defendant abides by his sex offender conditions); Fed. R. Crim. Pro. 32.1(b) Advisory Committee Notes (1979) (stating that the court should be allowed to modify conditions of release to respond not only to changes in circumstances, but also to new information: that is, "new ideas and methods of rehabilitation"). "So long as the court, when modifying supervised release conditions, considers the relevant 18 U.S.C. § 3553(a) sentencing factors, there is no additional requirement that it make a finding of new or changed circumstances with respect to the defendant." United States v. Parisi, 821 F. 3d 343, 347 (2nd Cir. 2016).

Events that occurred after sentencing may also justify a modification of the conditions of Supervised Release. For example, in United States v. Smith, where the defendant was convicted of committing fraud by abusing his position at a law firm, it was

held to be permissible to modify the conditions of his Supervised Release to bar the defendant from working with any attorney or law firm for three years, in response to a job offer from local attorneys after the defendant was released from custody. 445 F. 3d 713, 715, 719 (3rd Cir. 2006); see also DiMasi, 2016 WL 6818346, at *23-26 (modifying conditions of Supervised Release to address the medical issues that justified defendant's early release from his prison sentence).

Before revising conditions of Supervised Release, the court must follow the procedures established by the relevant Rule of Criminal Procedure, Rule 32.1(c). See 18 U.S.C. §3583(e)(2). Federal Rule of Criminal Procedure 32.1(c)(1) states, in part, that "[b]efore modifying the conditions of probation or supervised release, the court must hold a hearing, at which the [defendant] has the right to counsel and an opportunity to make a statement and present any information in mitigation." In addition, the court must provide a "reasoned and case-specific explanation for the conditions it imposes." DaSilva, 844 F. 3d at 11.

IV. THE MODIFIED CONDITIONS OF McDONOUGH'S SUPERVISED RELEASE

The Standard Conditions and Special Conditions of Supervised Release imposed when McDonough was sentenced on September 9, 2011 will remain in effect. In addition, the following special conditions are being imposed:

17

1.  McDonough shall participate in any substance abuse program prescribed by Probation, which may include up to 104 drug tests per year and up to 208 alcohol tests per year. Such testing shall include, but not be limited to, the use of the Outreach Smartphone Monitoring, including but not limited to its video-check-in and breathalyzer capacity and its location monitoring capacity. McDonough shall pay for the cost of such testing or monitoring.

2.  McDonough shall not possess or consume any alcohol.

3.  McDonough shall not use any controlled substance without a doctor's prescription and the approval of Probation.

4.  McDonough shall not reside in any premises where alcohol is present.

5.  Except with the prior approval of Probation, McDonough shall not associate with any individual who he knows is consuming alcohol. In addition, McDonough shall not associate with any individual he knows is using a controlled substance not prescribed by a doctor. Any unapproved and unanticipated association with any such person consuming alcohol or using a controlled substance not prescribed for him or her shall be reported by McDonough to Probation within 12 hours.[6]

6.  McDonough shall not enter any establishment whose primary purpose is selling alcohol or alcoholic beverages, including but not limited to beer, wine, or liquor.[7]

---

[6] Condition 5 has been modified in response to McDonough's Motion to Reconsider.

[7] Condition 6 has been corrected in response to McDonough's Motion to Reconsider. The January 9, 2017 Order mistakenly used the word "sell" rather than "selling" with regard to businesses that provide drinks to consumers. The court intended to prohibit McDonough from entering an establishment whose primary purpose is selling alcohol, meaning drinks, to consumers. In essence, Condition 6 prohibits McDonough from entering a liquor store or bar, but not a restaurant or supermarket which sells alcoholic beverages incidental to its primary business.

7. McDonough shall not engage in any employment or activity for remuneration without the prior approval of Probation. Probation may require disclosure of information concerning McDonough's history or circumstances to any prospective employer or business associates.

The court finds that the foregoing conditions are necessary and appropriate in view of McDonough's present history and characteristics, the need to provide him with medical care and correctional treatment in the most effective manner, and, with regard to employment, also the need to protect the public. See 18 U.S.C. §3553(a)(1) and (2)(C)&(D). They are consistent with the pertinent policy statements of the Sentencing Guidelines. See U.S.S.G. §5D1.3(b). In addition, they involve no greater deprivation of McDonough's liberty than is reasonably necessary to serve the relevant statutory purposes. See §3583(d); DaSilva, 844 F. 3d at 11.

McDonough's history now includes a finding by the BOP that he has a substance abuse disorder. The record now includes information on which the BOP based that finding. McDonough has completed an expensive, intensive 500 hour residential substance abuse treatment program, focusing primarily on alcohol abuse. He has also participated in out-patient alcohol treatment at Hope House, Inc.

There is no argument, let alone evidence, that the alcohol abuse disorder the BOP diagnosed has been "cured." McDonough's

RDAP counselor noted that it is important that he recognize that "substance dependence does not have a definitive cure." Baker Decl. Ex. 8 at 2 (Docket No. 876-3 at 25 of 35). As the First Circuit wrote in another case involving conditions relating to alcohol abuse, "treatment alone, without some form of disciplined follow-up, is unlikely to prove successful in the long-run." Brown, 235 F. 3d at 6. As explained at the January 5, 2017 hearing, Probation regularly recommends, and judges regularly order, drug and alcohol testing and treatment, as well as related conditions of Supervised Release, for former inmates who have participated in the RDAP. If the court had the information now available when it sentenced McDonough in 2011, it would have imposed conditions similar to those now being ordered, and probably a longer period of Supervised Release as well.[8]

As the First Circuit has held, a history of alcohol abuse makes a prohibition on the possession and use of alcohol reasonable. See United States v. Allen, 312 F. 3d 512, 515 (1st Cir. 2002); United States v. Thurlow, 44 F. 3d 46, 47 (1st Cir. 1995). The BOP found that McDonough has such a history. Therefore,

---

[8] The facts that McDonough implicitly claims that he lied to the Probation Officer who prepared the PSR and that there is now reason to believe he requires treatment for a substance abuse disorder provide justification for extending the length of McDonough's Supervised Release beyond two years. See $3583(d). Although the court is not now doing so, these matters will be considered if issues concerning McDonough's Supervised Release arise in the future.

now prohibiting McDonough from possessing and using alcohol is reasonable.

Section §3563(b)(6) provides that the court may require that a defendant "refrain from frequenting specified kinds of places or from associating unnecessarily with specified persons" if the restrictions are reasonably related to the defendant's history and characteristics. In Allen, 312 F. 3d at 515, the First Circuit affirmed the imposition of conditions prohibiting the defendant from consuming alcoholic beverages or frequenting establishments whose primary product to consumers was alcoholic beverages. See also United States v. Forde, 664 F. 3d 1219, 1222 (8th Cir. 2012)(upholding conditions prohibiting defendant from using alcohol or entering bars). McDonough has not objected to comparable new conditions in this case. They are, in any event, justified.

However, at the January 5, 2016 hearing, McDonough argued that some of the other proposed conditions were unnecessary or unduly restrictive because he could be trusted to maintain his sobriety. These arguments were not persuasive. McDonough has demonstrated that the court cannot rely on his "good faith" in complying with the condition that he not drink alcohol. As the First Circuit wrote in another case, "little about the defendant or his history suggests that good faith will be forthcoming." United States v. Tortora, 922 F. 3d 880, 886-87 (1st Cir. 1991). McDonough's representations have repeatedly proven to be

unreliable. He was convicted of committing mail fraud and wire fraud in this case. He, in effect, now asserts that he lied to Probation when he claimed that he had not used drugs illicitly since the 1990s or ever abused alcohol, and that he had no need for any drug or alcohol treatment. In addition, McDonough is now being prosecuted by the Commonwealth of Massachusetts for allegedly defrauding the state pension fund by falsely claiming that he was employed full-time at a public agency when he was, in fact, a private lobbyist. See A. Estes, "Lobbyist's job was no-show, state says," The Boston Globe (Jun. 21, 2011).

Moreover, as explained earlier, McDonough's RDAP counselor characterized McDonough's prognosis for avoiding future alcohol abuse as only "fair." Baker Decl. Ex. 8 at 3 (Docket No. 876-3 at 26 of 35). The counselor also noted that McDonough minimized the danger of potential "relapse triggers." Id. at 2. Therefore, the court finds that it is important to impose reasonable conditions to minimize McDonough's encounters with such triggers. It is also important to provide for monitoring of McDonough's compliance with the conditions of his Supervised Release, in part to deter him from succumbing to the temptation to drink. See §§3553(a)(2)(B).

At the January 5, 2017 hearing McDonough expressed concern about the condition authorizing Probation to test him for use of alcohol up to 208 times each year. The First Circuit has held that the court may not delegate to Probation the authority to determine

22

the maximum number of tests that may be performed beyond the minimum of three prescribed by statute. See United States v. Sepulveda-Contreras, 466 F. 3d 166, 172-73 (1st Cir. 2006)(citing United States v. Melendez-Santana, 353 F. 3d 93, 102-05 (1st Cir. 2003)). The court may, however, establish a maximum number of tests to be performed and allow probation officers to exercise discretion concerning the number of drug tests to be administered within that range. See Melendez-Santana, 353 F. 3 at 103.

Judges in the District of Massachusetts often authorize up to 104 drug tests a year. The court understands that the use of drugs can be detected for several days and, therefore, testing up to twice a week is usually sufficient to determine if a condition prohibiting the use of drugs has been violated. However, alcohol can only be detected for hours after use. Therefore, the court finds that it is appropriate to authorize a greater number of tests concerning alcohol.[9]

The court is also ordering that McDonough's compliance with the conditions of his Supervised Release be monitored by Probation in part by using the Outreach Smartphone Monitoring ("OSM") technology discussed at the January 5, 2017 hearing or other

---

[9] While the court finds it most appropriate to authorize up to 208 tests a year to determine if McDonough has used alcohol, Probation is not required to administer that many tests. Rather, the court expects that Probation will exercise appropriate judgment in deciding how often to test McDonough initially and over time.

technology. See Jan. 5, 2017 Ex. 1. The OSM breathalyzer feature will permit Probation to notify McDonough of the need to take a test for alcohol immediately, observe him by video taking the test using the breathalyzer feature of the OSM device, and evaluate the results. Use of the OSM technology, in conjunction with McDonough's smartphone, will be more efficient, and less of an intrusion on McDonough's privacy and liberty, than relying solely on random visits by a Probation Officer to administer conventional breathalyzer tests, which are also permitted.

Probation is also authorized to use the location monitoring feature of the OSM device to determine if McDonough is in a place prohibited by the conditions of his Supervised Release. Once again, use of the OSM device will be less burdensome for McDonough, and Probation as well, than traditional electronic monitoring, which the court has considered, but is not now requiring.

At the January 5, 2017 hearing, McDonough also objected to the condition that he not reside in any place where alcohol is present. McDonough's counsel explained that McDonough's wife started a wholesale wine business while he was incarcerated, and she holds wine tastings at their home. McDonough contends that banning alcohol from their home would unnecessarily injure her business.

However, the court finds that prohibiting alcohol in any home in which McDonough resides is justified and appropriate. McDonough

does not have a proven record of abstinence while in the community. As explained earlier, in comparison to drugs, the use of alcohol is difficult to detect. As also indicated earlier, McDonough's counselor in the RDAP program expressed concern that Mrs. McDonough's wine business could trigger a relapse, and that McDonough minimized that risk by viewing himself as cured. See Baker Decl., Ex. 8 at 2 (Docket No. 876-3 at 26). If McDonough is to be believed, he was previously able to maintain sobriety for several years before relapsing. Common sense suggests that allowing alcohol in McDonough's home generally, and permitting wine tastings particularly, would create the unwarranted risk that the efforts of the BOP and Probation to provide McDonough with effective treatment will be undermined.[10]

This reasoning is also applicable to the objection at the January 5, 2017 hearing to the condition that McDonough not be in the presence of any individual he knows is consuming alcohol and/or using a controlled substance not prescribed by a doctor. McDonough asserts that his future business activities may require that he dine with people who are drinking. However, as explained earlier, McDonough's doctor noted that the drinking that contributed to concern about McDonough's blood pressure and cholesterol was

_____

[10] If the prohibition against alcohol in the McDonough home injures Mrs. McDonough's wine business, she will suffer a form of the collateral consequences that are unfortunately common when a defendant must serve a sentence.

linked to the frequent entertaining he did as a lobbyist. See Kotch Decl. Ex. F (Docket No. 886) at 9-10. Similarly, in an interview with his RDAP counselor, McDonough "explained [that] drinking was a common social activity in politics, and he often justified his drinking by deciding he deserved it as a reward for his hard work." Baker Decl. Ex. 8 at 1. The court finds that it is important that McDonough not resume a professional life-style that involves "wining and dining" others in order to minimize the risk that McDonough will, without detection, drink again himself.

In his Motion to Reconsider, McDonough asserts that the condition that he not associate with any individual he knows is (a) consuming alcohol and/or (b) using a controlled substance not prescribed by a doctor could be violated by a "casual or chance meeting." Docket No. 922 at 3. He asks that the condition be revised to make an exception for such occasions. McDonough also contends that the condition would prohibit him from attending large events with family and friends who may drink, such as barbeques or dinners at a friend's home. Id.

The new condition concerning association is intended to prohibit planned encounters that McDonough foresees will involve someone who is drinking or illicitly using controlled substances. Its goal is to keep McDonough from resuming a lifestyle that requires regular contact with people who are drinking in a business or social setting. The court does not, however, wish to keep

26

McDonough from being with members of his family or close friends who are not individuals with whom McDonough reportedly drank regularly and, perhaps, used drugs illegally. Therefore, the court is modifying the fifth new condition of Supervised Release included in the January 9, 2017 Order to permit McDonough to attend family or other social occasions at which it is foreseeable someone will be drinking alcohol if he fully discloses the relevant facts to Probation and obtains its prior permission to attend. See DaSilva, 844 F. 3d at 14 ("[G]iving the probation officer some authority to make exceptions as warranted is generally seen as a benefit...in that it allows flexibility and permits personal circumstances to be dealt with as they arise."); Pabon, 819 F. 3d at 31-32.

The court recognizes that McDonough may, nevertheless, attend a meeting or event at which he did not foresee that someone would be drinking. If this occurs, and is reported to Probation within 12 hours, the court will not consider it a violation of McDonough's conditions of Supervised Release. See Pabon, 819 F. 3d at 25 ("[A]ssociational restrictions are usually read to exclude incidental encounters. Thus, we read the no-contact condition as only covering intentional contact."); see also DaSilva, 844 F. 3d at 15 (same).

Finally, the court is ordering that McDonough not engage in any employment for remuneration without the prior approval of Probation. This condition is appropriate both to protect the

public, see §3553(a)(2)(c), and to minimize the risk that McDonough will resume a professional lifestyle that will put him at risk of resuming his reported abuse of alcohol, see §3553(a)(2)(D). McDonough's work as a lobbyist led to his conviction in this case. As explained earlier, that work was, according to McDonough, a cause of his reported heavy drinking.

At the January 5, 2017 hearing, McDonough's counsel stated that McDonough is hoping to serve as a consultant to provide advice to companies on issues at the intersection of business and public policy, and might try to become a registered lobbyist again. See Jan. 5, 2017 Tr. at 20-21. As McDonough's work as a lobbyist resulted in his conviction in this case, the court has the authority to prohibit the same or similar work. See §3563(b)(5)(the court may require that a defendant "refrain from engaging in a specified occupation, business, or profession bearing a reasonably direct relationship to the conduct constituting the offense"); Smith, 445 F. 3d at 719. In addition, because of the reported linkage between McDonough's work as a lobbyist and his drinking, prohibiting a return to the same or similar work would also serve the interest of effectively treating what BOP found to be McDonough's substance abuse disorder. See §3553(a)(2)(D).

It is questionable whether any client would want to hire a "consultant" on governmental affairs who has been convicted of conspiring with corrupt public officials. It is equally uncertain

whether any honest government official would deal with McDonough. Therefore, the issue of whether McDonough should be allowed to work as a lobbyist or as a consultant on government affairs may be academic.

In any event, the court does not wish to discourage McDonough from engaging in legitimate work that does not create a foreseeable risk that he will resume drinking or commit crimes again. While the prospect of McDonough working in real estate was also mentioned, see Jan. 5, 2017 Tr. at 20, it is not possible to predict what forms of employment McDonough might seek. Therefore, the court finds that a procedure requiring that Probation approve any proposed remunerative work is justified and more appropriate than a prohibition on lobbying or any other form of work that can be identified now.

The court expects, however, that Probation will not allow McDonough to engage in any remunerative work that would provide an opportunity to commit the type of crimes involved in this case in order to protect the public while he is on Supervised Release. See §3553(a)(2)(C); Smith, 445 F. 3d at 719. The court also expects that Probation will not authorize any employment that involves the risk that McDonough will resume drinking while working. See §3353(a)(2)(D).

In summary, the court finds that in view of McDonough's history and characteristics, the need to maximize the potential

for success of the treatment that was provided by the BOP and that will be provided by Probation, and with regard to McDonough's employment the need to protect the public as well, each of the new conditions of McDonough's Supervised Release now being imposed is reasonably necessary and appropriate.

V. ORDER

In view of the foregoing, it is hereby ORDERED that McDonough's Motion for Reconsideration (Docket No. 922) is ALLOWED to the limited extent described in this Memorandum, and that the special conditions of his Supervised Release are modified to include the following:

1. McDonough shall participate in any substance abuse program prescribed by Probation, which may include up to 104 drug tests per year and up to 208 alcohol tests per year. Such testing shall include, but not be limited to, the use of the Outreach Smartphone Monitoring, including but not limited to its video-check-in and breathalyzer capacity and its location monitoring capacity. McDonough shall pay for the cost of such testing or monitoring.

2. McDonough shall not possess or consume any alcohol.

3. McDonough shall not use any controlled substance without a doctor's prescription and the approval of Probation.

4. McDonough shall not reside in any premises where alcohol is present.

5. Except with the prior approval of Probation, McDonough shall not associate with any individual who he knows is consuming alcohol. In addition, McDonough shall not associate with any individual he knows is using a controlled substance not prescribed by a doctor. Any unapproved and unanticipated association with any such person consuming alcohol or using a controlled substance not prescribed for him or her shall be reported to Probation within 12 hours.

6. McDonough shall not enter any establishment whose primary purpose is selling alcohol, including but not limited to beer, wine, or liquor.

7. McDonough shall not engage in any employment or activity for remuneration without the prior approval of Probation. Probation may require disclosure of information concerning McDonough's history or circumstances to any prospective employer or business associates.

UNITED STATES DISTRICT JUDGE