UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,      )
                               )
        v.                     )
                               )  Cr. No. 09-10166-MLW
RICHARD W. McDONOUGH,          )
        Defendant.             )

## MEMORANDUM AND ORDER

WOLF, D.J.                                    March 29, 2018

### I.   INTRODUCTION

On September 9, 2011, a jury convicted Salvatore DiMasi and Richard McDonough, a lobbyist, for conspiring to commit honest services mail fraud, honest services wire fraud, and extortion under color of official right, as well as for honest services mail fraud and wire fraud. See 18 U.S.C. §§371, 1341, 1343, 1346, and 1951. The evidence at trial showed, in essence, that McDonough conspired with his client, Joseph Lally, to pay DiMasi to use his official power as Speaker of the Massachusetts House of Representatives to obtain more than $17,000,000 in state software contracts for Lally's employer, Cognos Corporation, and later his company, Montvale Solutions. Lally pled guilty, cooperated with the government, and testified at trial against DiMasi, McDonough, and a fourth alleged co-conspirator, Richard Vitale, who was acquitted. The payments to DiMasi were made in the form of purported referral fees through his unwitting associate in the

practice of law Stephen Topazio, and through Vitale. See United States v. DiMasi, 810 F. Supp. 2d 347, 356-62 (D. Mass. Aug. 30, 2011).

The court denied the defendants' motions for acquittal and a new trial. Id. DiMasi was sentenced to eight years in prison and McDonough to seven years in prison. The court subsequently denied their motions for release pending appeal. See United States v. DiMasi, 817 F. Supp. 2d 9, 12 (D. Mass. Oct. 11, 2011). McDonough began serving his sentence on November 30, 2011. In 2013, the First Circuit affirmed McDonough's conviction and sentence. See United States v. McDonough, 727 F. 3d 143, 166 (1st Cir. 2013). On January 27, 2014, the Supreme Court denied certiorari, and his conviction and sentence became final. See McDonough v. United States, 134 S. Ct. 1041 (2014).[1]

On January 26, 2015, McDonough timely filed a petition to vacate his conviction and sentence pursuant to 28 U.S.C. §2255 (the "Petition"). McDonough asserts that his trial counsel, Thomas Drechsler, was constitutionally ineffective because: (1) he "fail[ed] to investigate and present expert testimony regarding

_____

[1] McDonough was released on January 3, 2017, one year before what would ordinarily have been the expiration of his sentence. The Bureau of Prisons released McDonough early because it found that he successfully completed its Residential Drug and Alcohol Abuse Program. See United States v. McDonough, 233 F. Supp. 3d 231, 236-39 (D. Mass. 2017). McDonough is now serving his two-year term of Supervised Release.

the 'blurred' but critical distinction between legal lobbying and the criminal conduct required to maintain [a] conviction for honest services fraud;" and (2) he failed to effectively "demonstrate that [McDonough's] normal professional activities included lobbying all branches of government" and to show that McDonough was "at all times acting within the boundaries of legal lobbying." McDonough asserts that Mr. Drechsler should have done so by: (a) confronting State Representative Robert Coughlin with prior inconsistent statements on cross-examination; and (b) calling Senator Joan Menard to rebut certain testimony given by Lally. Memo. in Supp. of Petition ("Memo.") at 4-5, 19, 19-26.

In response to the Petition, the government requested that the court find that McDonough waived attorney-client privilege by filing his Petition; order Mr. Drechsler and counsel for DiMasi and Vitale to disclose any information reasonably necessary to enable the government to respond to the Petition; and extend the deadline for the government to do so. See United States' Motion for Order Regarding Waiver of Attorney-Client Privilege and for Extension of Time to File Response (Docket No. 857). McDonough opposed that request. See Response to Government Motion for Waiver to Attorney-Client Privilege (Docket No. 863).

The court has reviewed McDonough's submissions, as well as the pertinent portions of the record. It finds that the existing record conclusively establishes that McDonough is not entitled to

3

relief under §2255. As explained below, the decisions not to call a lobbying expert, confront Representative Coughlin with past inconsistent statements, or call Senator Menard did not constitute ineffective assistance, and there is not a reasonable likelihood that McDonough would have been acquitted if his counsel had done so. Accordingly, the Petition is being denied. The government's request for information from counsel for defendants is, therefore, moot.

II.   APPLICABLE LAW

A.   18 U.S.C. §2255 Proceedings

A prisoner in federal custody may collaterally attack his conviction under 28 U.S.C. §2255. As the First Circuit has explained:

> Section 2255 contemplates four potential bases on which a federal prisoner may obtain relief: (1) "that the sentence was imposed in violation of the Constitution or laws of the United States"; (2) "that the court was without jurisdiction to impose such sentence"; (3) "that the sentence was in excess of the maximum authorized by law"; or (4) that the sentence "is otherwise subject to collateral attack." 28 U.S.C. § 2255(a).

Damon v. United States, 732 F.3d 1, 3 (1st Cir. 2013) (quoting 28 U.S.C. §2255(a)). In an action under §2255, "[t]he burden of proof is on the petitioner." Wilder v. United States, 806 F.3d 653, 658 (1st Cir. 2015), cert. denied, 136 S. Ct. 2031 (2016).

When a prisoner files a §2255 petition, 28 U.S.C. § 2255(b) requires that:

4

> Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto.

28 U.S.C. §2255(b). As the First Circuit wrote in United States v. McGill, 11 F.3d 223 (1st Cir. 1993):

> We have distilled these principles into a rule that holds a hearing to be unnecessary "when a §2255 motion (1) is inadequate on its face, or (2) although facially adequate is conclusively refuted as to the alleged facts by the files and records of the case." Moran v. Hogan, 494 F. 2d 1220, 1222 (1st Cir. 1974). In other words, a "§2255 motion may be denied without a hearing as to those allegations which, if accepted as true, entitle the movant to no relief, or which need not be accepted as true because they state conclusions instead of facts, contradict the record, or are 'inherently incredible.'" Shraiar v. United States, 736 F.2d 817, 818 (1st Cir. 1984) (citations omitted).

Id. at 225-26 (some citations omitted); see also United States v. Panitz, 907 F.2d 1267 (1st Cir. 1990); David v. United States, 134 F.3d 470, 478 (1st Cir. 1998) ("To progress to an evidentiary hearing, a habeas petitioner must do more than proffer gauzy generalities or drop self-serving hints that a constitutional violation lurks in the wings."). "Moreover, when...a petition for federal habeas relief is presented to the judge who presided at the petitioner's trial, the judge is at liberty to employ the knowledge gleaned during previous proceedings and make findings

based thereon without convening an additional hearing." <u>McGill</u>, 11 F.3d at 225.


B.   <u>Ineffective Assistance of Counsel</u>

"The Sixth Amendment guarantees criminal defendants the right to effective assistance of counsel." <u>Lema v. United States</u>, 987 F.2d 48, 51 (1993) (citing <u>Strickland v. Washington</u>, 466 U.S. 668 (1984)). "But the Constitution does not guarantee a defendant a letter-perfect defense or a successful defense; rather, the performance standard is that of reasonably effective assistance under the circumstances then obtaining." <u>Id.</u> at 51. To succeed on an ineffective assistance of counsel claim, a petitioner must demonstrate: (1) that "counsel's performance fell below an objective standard of reasonableness"; and (2) that the petitioner was prejudiced by his counsel's deficiency. <u>Strickland</u>, 466 U.S. at 699-689; <u>Argencourt v. United States</u>, 78 F.3d 14, 16 (1st Cir. 1996).

"The first prong--constitutional deficiency--is necessarily linked to the practice and expectations of the legal community: The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." <u>Hinton v. Alabama</u>, 134 S. Ct. 1081, 1088 (2014)(citations omitted). "Judicial scrutiny of counsel's performance must be highly

6

deferential," and "every effort [should] be made to eliminate the distorting effects of hindsight." Strickland, 466 U.S. at 689. The court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. at 689. For the petitioner to prevail under Strickland, a strategic choice must have been "so patently unreasonable that no competent attorney would have made it." Hensley v. Roden, 755 F.3d 724, 737 (1st Cir. 2014).

"The decision whether to call a particular witness is almost always strategic, requiring a balancing of the benefits and risks of the anticipated testimony." Lema, 987 F.2d at 54. When potential testimony presents a "mixed bag" that might have a "possible negative impact" on the defendant's case, the decision not to elicit it is unlikely to be "patently unreasonable." Hensley, 755 F.3d at 737.

To show prejudice under Strickland, the petitioner must show "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694. Counsel's errors must be "so serious as to deprive the defendant of a fair trial,

a trial whose result is reliable." Id. at 287. As the Court later clarified:

> [T]he question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. Instead, Strickland asks whether it is "reasonably likely" the result would have been different. This does not require a showing that counsel's actions "more likely than not altered the outcome," but the difference between Strickland's prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable.

Harrington v. Richter, 562 U.S. 86, 111-12 (2011). The court must consider "the totality of the evidence before the judge or jury," accepting the factual findings unaffected by the errors and "taking due account of the effect of the errors on the remaining findings." Strickland, 446 U.S. at 695-96. It must then determine "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Hinton, 134 S. Ct. at 1089.

"Where, as here, a petitioner asserts that counsel failed to introduce evidence or challenge the credibility of government witnesses on cross-examination, [the First Circuit] consider[s] three factors: 'first, the strength of the prosecution's case; second, the effectiveness of the defense that was presented at trial; third, the potential value of the new evidence and new avenues for cross-examination in undermining the credibility of

the government witnesses' testimony.'" Turner v. United States, 699 F.3d 578, 584 (1st Cir. 2012)(quoting Dugas v. Coplan, 506 F.3d 1, 9 (1st Cir.2007)).

"[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." Strickland, 466 U.S. at 697. "Addressing the prejudice prong prior to evaluating counsel's conduct is a permissible approach and even endorsed where more efficient." Gonzalez-Soberal v. United States, 244 F.3d at 273, 277-78 (1st Cir. 2001).

III. DISCUSSION

A. Failure to Call an Expert on Lobbying

As indicated earlier, McDonough argues that his counsel was ineffective because he did not call at trial an expert to "address the inherently blurry line" that separates legal lobbying from conspiring to engage in honest services fraud. To find McDonough guilty of the offense, the jury was required to find, among other things, that McDonough intended that DiMasi be paid to influence an official act, and not just to cultivate business or a political friendship with him. See McDonough, 727 F. 3d at 160;[2] see also

---

[2] As the court instructed the jury, and McDonough does not now contest, "it was not necessary for the government to prove that the scheme involved making a specific payment for a specific official act; rather, it would be sufficient if the government

9

U.S. v. Sawyer, 85 F. 3d 713, 741 (1st Cir. 1996). McDonough asserts that "an expert would have testified as to the wide range of accepted legal lobbying behavior that is meant to encourage friendship between [a lobbyist's] clients and decision makers." Memo. at 17-18. In particular, he asserts that:

> An expert would have testified that it was part of the normal, accepted, and legal functioning of a lobbyist[:] to use his connections in all branches of government to present the benefits of his client's product and services[;]...to discuss and urge the attributes of legislation favorable to his clients within these same branches of government[;]...[and to] hir[e] individuals 'close' to decision-makers to encourage friendship and goodwill.

Id.

Defendants proposed, before trial, three experts who would similarly testify to practices that were commonplace and, in the witnesses' opinion, ethical in the business of lobbying. See Docket No. 450. The court ruled that expert testimony concerning lobbying

---

proved beyond a reasonable doubt a scheme to make a series of payments in exchange for DiMasi performing official actions benefitting Lally or Cognos as opportunities arose or when DiMasi was called upon to do so." DiMasi, 810 F. Supp. 2d at 356, aff'd, McDonough, 727 F. 3d at 152-53.

To show that McDonough conspired to commit extortion under color of official right, the government had to prove that he conspired to "obtain a payment to which [DiMasi] was not entitled, knowing that the payment was made in return for [DiMasi's] official acts." McDonough, 727 F. 3d at 155. Because, as explained below, there is no reasonable probability that the alleged ineffective assistance would have created a reasonable doubt regarding the charges of honest services fraud and a conspiracy to commit it, the same is true for the conviction for conspiracy to commit extortion. Id. at 156.

could be given to a certain extent. See April 20, 2011 Tr. at 38.
None of the three defendants ultimately called the expert witnesses
at trial. McDonough asserts that "an expert would have demonstrated
that Petitioner's conduct neither fell on the illegal side of the
line nor did his intent manifest a desire to inappropriately
compensate Speaker DiMasi in exchange for illegal acts." Memo. at
18.

An expert would not have been permitted to testify to
McDonough's intent. "In a criminal case, an expert witness must
not state an opinion about whether the defendant did or did not
have a mental state or condition that constitutes an element of
the crime charged or of a defense. Those matters are for the trier
of fact alone." F.R.E. 704(b). In addition, he or she would not
have been allowed to give a legal opinion. See 4-702 Weinstein's
Federal Evidence §702.03[3] (2018) (" Expert testimony is not
admissible to inform the trier of fact as to the law that it will
be instructed to apply to the facts in deciding the case. That is
a matter reserved exclusively for the trial judge."); Marx & Co.
v. Diner's Club Inc., 550 F. 2d 505, 508-09 (2d Cir. 1977). The
expert would only have been allowed to testify "regarding the
routine practices of lobbyists." April 20, 2011 Tr. at 38; see
also Marx, 550 F. 2d at 509. The court found that such testimony
"w[ould] assist the jury in deciding [whether] the conduct at issue
in this case was routine lobbying or bribery." April 20, 2011 Tr.

11

at 38; see also United States v. Henry, 848 F. 3d 1, 11-13 (1st Cir. 2017)("Rule 704(b) bars a witness from characterizing the defendant's intent, but it does not, however, apply to predicate facts from which a jury might infer such intent."). However, the court on April 20, 2011 only found that the testimony was admissible, not that it would be persuasive, important, or helpful to the defendants. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 596 (1993).

The decision of all defense counsel, including Mr. Drechsler, not to call an expert to testify regarding the routine practices of lobbyists was professionally reasonable. As the court stated in denying McDonough's motion for acquittal, as the First Circuit stated in affirming McDonough's conviction, and as the Supreme Court recognized in Skilling v. United States, 561 U.S. 358, 407-08 (2010), payments through a middleman to a public official in exchange for the favorable exercise of his official powers constitute the "paradigmatic" case of honest-services fraud. DiMasi, 810 F. Supp. 2d at 361; McDonough, 727 F. 3d at 153. It is likely that any expert would have testified on cross-examination that using a middleman like Topazio as a conduit for secret payments to a legislator who did nothing legitimate to earn them is not a customary lobbying practice. Therefore, as in Hensley, 755 F.3d at 737, Mr. Drechsler could have reasonably decided that an expert would have done more harm than good for McDonough. See

also United States v. Turner, 793 F. Supp. 2d 495, 505 (D. Mass. 2011)(Saris, D.J.), aff'd, 699 F. 3d 578, 584 (1st Cir. 2012)(finding that a failure to elicit testimony that was "two-edged sword" and could have harmed the defendant's case did not make acquittal reasonably likely). Evidently, DiMasi's counsel, Thomas Kiley and William Cintolo, and Vitale's attorney Martin Weinberg, as well as Mr. Drechseler, reached this conclusion as none of them called an expert on lobbying to testify.

In addition, it is not reasonably probable that expert testimony describing routine lobbying practices would have persuaded the jury to acquit McDonough. The court instructed the jury several times that payments made "to cultivate a business or political relationship" with a public official, or to compensate someone for "lobby[ing] public officials, meaning to advocate positions to public officials or to provide strategic advice to clients seeking public contracts or for business advice," do not support convictions for mail or wire fraud. DiMasi, 817 F. Supp. 2d at 18 (quoting June 13, 2011 Tr. at 42); see also McDonough, 727 F. 3d at 158. Specifically with regard to intent, the court explained that a conviction for honest services fraud required proof that payments were made to DiMasi "with the intent to influence an official act and be received with the intent to be influenced in an official act." DiMasi, 810 F. Supp. 2d at 356. It instructed, based on Sawyer, 85 F. 3d at 720-21, that:

[I]n this case it would not be enough if the government proves only that a defendant genuinely believed that Cognos and/or Lally made the payments at issue only to cultivate a business or professional relationship with DiMasi or to express gratitude for something DiMasi had done. In other words, if the defendant knew of any of the payments at issue and had a sincere good faith belief that they were being made only for one of these legitimate purposes, he would not be guilty of mail or wire fraud even if that belief was erroneous.

DiMasi, 817 F. Supp. 2d at 18, aff'd McDonough, 727 F. 3d at 156–58. The jury is presumed to have followed these instructions and, therefore, to have understood that McDonough could not be convicted based only on advocacy, providing a gratuity, or making payments to cultivate a business or professional relationship. See Weeks v. Angelone, 528 U.S. 225, 234 (2000). In view of the instructions, which went beyond what was required, see DiMasi, 817 F. Supp. 2d at 19, and the limitations on admissible testimony, an expert would have added little, if anything, to the jury's understanding of the line between legal lobbying and illegal bribes.

In any event, such testimony would have had slight relevance, if any, to the facts. The evidence at trial demonstrated that McDonough's conduct went far beyond "us[ing] his connections...to present the benefits of [Cognos'] product," "urg[ing] the attributes of legislation favorable to [Cognos]," or "hiring individuals 'close' to decision-makers to encourage friendship and goodwill." Id.

In denying McDonough's motions for a new trial and a stay of his sentence pending appeal, the court found "overwhelming" evidence that McDonough directed Lally to pay DiMasi to exercise his official powers to benefit Cognos, and not merely to cultivate a friendship with him. DiMasi, 817 F. Supp. 2d at 21. The bribes were covertly funneled to DiMasi through sham retainer fees for legal services Topazio was not expected to perform and did not perform. Id. at 16; see also DiMasi, 810 F. Supp. 2d at 356, 358. The majority of the payments to Topazio were taken by DiMasi, who also did no legal work to earn them. Id. at 357. The government proved these payments were "quid pro quo bribery." DiMasi, 817 F. Supp. 2d at 16. The First Circuit agreed that "there can be little doubt that the Topazio contract was a sham. It first called for the performance of services that Topazio ordinarily did not render and then ultimately paid him for doing no work." 727 F. 3d at 154. In addition, Lally testified that he used the purported retainer agreement to "funnel money to the Speaker DiMasi...to gain favor with the Speaker, to have him help [Cognos] close software, cut deals, and obtain funding for us." DiMasi, 817 F. Supp. 2d at 16 n. 39 (quoting May 18, 2011 Tr. at 33-34).

There was additional evidence that McDonough knew the retainer contract was a concealed bribe. Topazio testified that McDonough proposed it as a "way[] to get money to DiMasi," and later arranged a six-month extension of it while DiMasi was working

to secure a state contract for Cognos. See DiMasi, 810 F. Supp. 2d at 356, 358. Several months after the payments to Topazio began, Lally told McDonough that it was "time for [the relationship with Topazio] to pay off." DiMasi, 817 F. Supp. 2d at 16. Lally also testified that McDonough later told him to pay an additional $100,000 each to McDonough and Vitale "to get the Speaker to get...the funding [for Cognos] through." 810 F. Supp. 2d at 358 (quoting May 18, 2011 Tr. at 57). McDonough also told Lally that the $100,000 was going to be funneled to DiMasi in the form of a line of credit from Vitale and it was. Id. Lally testified that during a golf game while DiMasi was still acting to assure that the allocation for the software contract remained in the state budget, DiMasi said to McDonough, "I am only going to be Speaker for so long, so it is important that we make as much hay as possible." Id. at 359 (quoting May 18, 2011 Tr. at 64). McDonough reacted by giving Lally a "high-five" and saying, "how about that. You got the Speaker telling you something like that." Id.

Other evidence confirmed that the coconspirators, including McDonough, knew that Lally's payments to DiMasi were illegal bribes. DiMasi asked Topazio to forward him a $25,000 payment from Cognos in four, small checks purportedly written on different dates instead of one lump sum, and later suggested that Topazio lose the part of his checkbook recording the transaction. See DiMasi, 810 F. Supp. 2d at 359-60. After Boston Globe reporters raised

questions about the Cognos contract, McDonough and Lally would frisk each other whenever they met to ensure that neither was "wearing a wire" to record their conversation. Id. at 360; McDonough, 727 F. 3d at 151. DiMasi told McDonough, Lally, and Vitale that "if one of us breaks, we all fall." Id.

Based on this evidence, this court found that, as in United States v. Potter, 463 F. 3d 9, 18-19 (1st Cir. 2006), "the risk of the jury confusing a distasteful gratuity for an illegal bribe did not exist...as it had in Sawyer I." DiMasi, 817 F. Supp. 2d at 19. "The $65,000 received by DiMasi personally" disguised as a sham retainer for which no legal work was ever requested or performed, "could not be confused with a mere gratuity" or "viewed as a way to cultivate friendship." Id. In contrast to Sawyer, this case did not involve small gifts such as tickets, trips, and meals, but rather large payments made covertly to DiMasi from Cognos with "overwhelming evidence that the payments to DiMasi through Topazio were part of a conspiracy" to buy the use of DiMasi's official powers. Id. at 21; McDonough, 727 F. 3d at 153 ("We conclude that a rational jury could easily find beyond a reasonable doubt that DiMasi and McDonough took part in a scheme that saw DiMasi exchange his official acts for money."). As a result, this court found that the evidence did not require the instruction that cultivating friendship by means of gifts was not honest services fraud, but it gave the instruction anyway. See DiMasi, 817 F. Supp. 2d at 19

(citing Potter, 463 F. 3d at 18-19). In addition, it found that the sufficiency of the evidence was not a close question. Id. at 15.

In view of the foregoing, the lack of expert testimony explaining that making gifts or hiring individuals close to politicians to "cultivate friendships" was routine, and of additional evidence that McDonough engaged in some legal lobbying, does not undermine the court's confidence in the verdict. As just explained, McDonough's conviction rests on overwhelming evidence that he "knew that Cognos was not hiring Topazio to do legal or lobbying work" and that "it was DiMasi as Speaker who had been retained..." DiMasi, 810 F. Supp. 2d at 364. As indicated earlier, unlike the occasional gift of a meal or a trip, large "payments through a middleman for the benefit of a public official," which McDonough "orchestrated," are "a 'paradigmatic' and 'classic' case of an honest services fraud scheme." Id. at 361-62. As the First Circuit wrote in affirming McDonough's conviction, "[t]hese actions fit comfortably into what the Supreme Court has described as a 'classic kickback scheme,' in which a public official uses a middleman to help another entity--here, Lally and Cognos--generate revenue or commissions and the proceeds are shared with the official and the middleman." McDonough, 727 F. 3d at 153; see also Skilling, 561 U.S. 358, 407-08. McDonough's proven conduct crossed far beyond any "blurry" line between legal lobbying and fraud. At

most, the proposed expert testimony, and the potential testimony discussed below, would have confirmed that McDonough engaged in some legal lobbying in addition to his participation in the conspiracy to covertly channel unlawful payments to DiMasi. This possibility does not justify vacating McDonough's conviction.

        B. <u>Failure to Elicit Testimony from Representative Coughlin and Senator Menard Regarding McDonough's Lobbying Efforts</u>

As the second basis for McDonough's claim of ineffective assistance of counsel, McDonough argues that Mr. Drechsler "failed to demonstrate that [McDonough] was engaged in legal lobbying by informed cross examination of government witnesses"--and in particular, Representative Coughlin. Memo. at 20. Representative Coughlin testified that at the request of DiMasi's legal counsel, Daniel Toscano, he introduced a budget amendment to fund a multi-million dollar state contract with Cognos. He indicated that he was "honored" to be asked by DiMasi's office to propose the amendment. See May 17, 2011 Tr. at 115. He also testified that he did not communicate with McDonough regarding the amendment. Id. at 125. McDonough asserts that Representative Coughlin testified differently to the grand jury by stating that it was McDonough's lobbying efforts, not DiMasi's legal counsel, that persuaded him to file the budget amendments. Memo. at 11-12 n. 2.

McDonough argues that Mr. Drechsler should have confronted Representative Coughlin with this purportedly contradictory grand

jury testimony on cross examination. He asserts that it would have revealed McDonough's ability to legally and successfully lobby the legislature, and would have undermined the government's contention that McDonough relied on bribes to DiMasi to get essential legislation enacted. Id. In support, McDonough submits an email from his appellate counsel, Martin Weinberg, stating that he spoke to Representative Coughlin on or about January 27, 2014. According to Mr. Weinberg's email, Representative Coughlin stated that McDonough, "not Sal/Toscano, delivered the language" for the budget amendment, and that Representative Coughlin advised counsel for defendants of this fact before his examination at trial, but none of them elicited it from him on cross-examination. See Memo Exhibit A (Docket No. 851 at 32 of 66).[3]

McDonough also argues that his counsel should have called Senator Joan Menard to testify to additional, purportedly legal lobbying efforts by McDonough. According to McDonough, Senator Menard would have testified that in a meeting, in which Lally also participated, McDonough asked her to file the budget amendment in the Senate and proposed language for the amendment that matched the version that had passed in the House of Representatives.

---

[3] To the email, Mr. Weinberg attached a draft of an affidavit of Representative Coughlin, which is unsigned and, therefore, not a statement by Coughlin entitled to any weight. Memo Exhibit A at 34.

According to McDonough, she also would have testified that "this was consistent with the customary practice of lobbying and the funding of budget appropriations." Memo. at 25. McDonough asserts that this would have impeached Lally's testimony, on cross-examination by DiMasi's counsel, that McDonough never asked the Senator to file the budget amendments at issue. See May 20, 2011 Tr. at 18-19. He asserts that Senator Menard's testimony would have demonstrated that McDonough was "at all times acting as a lobbyist within the accepted parameters of his profession" and did not "lean[] solely on House Speaker DiMasi to run his clients' priorities through the appropriations process." Memo. at 25.

Even if Mr. Drechsler had reason to know that McDonough drafted the budget amendment and lobbied Representatives Coughlin and Senator Menard for its passage, his decision not to elicit that testimony through either individual was reasonable. Mr. Drechsler could have reasonably decided that such testimony, as well as that of a lobbying expert, would have harmed McDonough's defense. See Hensley, 755 F.3d at 737; Turner, 793 F. Supp. 2d at 505. In particular, the jury could have considered the testimony concerning Representative Coughlin as additional evidence that McDonough collaborated with DiMasi, who had been bribed, and his staff in the effort to obtain funds for Cognos. The fact that McDonough did not bribe Senator Menard would not have been meaningful evidence of whether he had participated in an illegal

scheme to pay DiMasi for the use of his official powers. Mr. Drechsler did not call Senator Menard, and reasonably decided to use his cross-examination of Representative Coughlin to establish that McDonough had advocated and proposed drafts of bills to Representative Coughlin in the past, and that this was a typical lobbying practice. See May 17, 2011 Tr. at 121-25.[4]

Moreover, for similar reasons, it is not reasonably probable that the possible additional testimony from Representative Coughlin and Senator Menard would have changed the verdict. It would not have caused the jury to disbelieve Lally's testimony, which the jury credited despite "intensive, skillful cross examination" attacking his credibility. DiMasi, 810 F. Supp. 2d at 363; see also McDonough, 727 F. 3d at 154. In addition, "because Lally was an immunized, cooperating witness with a motive to lie to strengthen the government's case and thus enhance his hope of getting a reduced sentence, the jury was instructed to examine his testimony with care and rely on it with caution." DiMasi, 810 F. Supp. 2d at 363. The cross-examination persuaded the court, and likely the jury, that "Lally had a long history of being an unsavory, dishonest businessman who would do almost anything to

---

[4] In addition, on direct-examination, Lally gave the testimony McDonough sough to elicit from Senator Menard, stating that the purpose of the meeting he and McDonough had with Senator Menard was to advocate for the proposal of a budget amendment in the Senate. See Tr. at May 18, 2011 at 74-75.

make money." Id. However, Lally's immunity agreement, which provided that he could be prosecuted for perjury, gave him an incentive to tell the truth at trial. Id. More significantly, much of Lally's testimony was corroborated by contemporaneous email messages and telephone records, as well as by the testimony of other witness and other evidence. Id.

Therefore, as indicated earlier, Mr. Drechsler's decision not to elicit additional testimony from an expert, Representative Coughlin, and Senator Menard does not undermine the court's confidence in the outcome of the trial. More specifically, the court is confident that the jury would still have found that Lally's testimony, along with the government's other evidence, established that "McDonough was the trusted intermediary at the hub [of the charged conspiracy], orchestrating an effort to insulate the conspirators from being held accountable for their scheme to exchange the use of DiMasi's official powers for payments from Cognos and Lally." Id. at 362. "Even if Lally's testimony was disbelieved and given no weight, the credible evidence support[ed] both the court's Petrozziello rulings [finding by a preponderance of the evidence that McDonough and his co-defendants committed the conspiracy] and the jury's verdicts." Id. at 364. There is no reasonable probability that the proposed evidence of McDonough's legal lobbying efforts would have produced a reasonable doubt concerning whether McDonough also conspired to bribe DiMasi.

In view of the foregoing, the Petition must be denied.

IV.   CERTIFICATE OF APPEALIBILITY

Rule 11(a) of the Rules Governing Section 2255 Proceedings requires that "The district court must issue or deny a certificate of appealability ["COA"] when it enters a final order adverse to the applicant." A COA will issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. §2253(c)(2); see Miller-El v. Cockrell, 537 U.S. 322 (2003). The applicant "must show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" Id. at 336. A claim "can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." Id. at 338. However, "a prisoner seeking a COA must prove something more than the absence of frivolity or the existence of mere good faith on his or her part." Id. at 337. The "issuance of a COA must not be pro forma or a matter of course" because by enacting the Anti-Terrorism and Effective Death Penalty Act "Congress confirmed the necessity and the requirement of differential treatment for those appeals deserving of attention from those that plainly do not." Id.

The court finds that reasonable jurists could not debate the conclusions that McDonough is not entitled to discovery or a hearing concerning his claims, and that those claims are unmeritorious. Therefore, a COA is also being denied.

V.   ORDER

Accordingly, it is hereby ORDERED that:

1.   McDonough's Motion under 28 U.S.C. §2255 to Vacate, Set Aside, or Correct his Sentence (Docket No. 850) is DENIED.

2.   A Certificate of Appealability is DENIED.

3.   The United States' Motion for Order Regarding Waiver of Attorney-Client Privilege and for Extension of Time to File Response (Docket No. 857) is MOOT.

UNITED STATES DISTRICT JUDGE